Good morning, everyone. The first case on our call this morning is Agenda Number 12, Case Number 105-395, the County of DuPage, et al. v. Illinois Labor Relations Board State Panel. Mr. Post, are you ready to proceed? Thank you, Your Honor. Good morning. May it please the Court, my name is Gerald Post. I'm an Assistant Attorney General of the Illinois Labor Relations Board in this matter. The final three minutes of the appellant's argument will be presented by Joseph Mazzoni, who is counsel for the Metropolitan Alliance of Police. In 2003, the General Assembly passed or added Section 9A-5 to the Public Labor Relations Act and comparable Section 7C-5 to the Illinois Educational Labor Relations Act. These sections were intended to provide a more comprehensive understanding of the role of public employees in the public sector. Historically, a union would present a showing of interest of at least 30 percent, and at that point, it would have a right to obtain an election, and after an election, a unit would be certified and a representative would be certified. These sections take that concept, but they move the showing of interest up to 50 percent. The 50 percent is significant. If there were an election, for example, in which only 40 percent of the employees showed up, 21 percent of the employees would in fact choose to have the union. This requires that right up front, there be an actual majority of all the employees showing interest in having union representation. The primary issue concerns the second sentence of Section 9A-5, which provides that the Board shall ascertain the employee's choice of basis of dues deduction authorization and other evidence. Now, the appellate court interpreted the word and in its joint, not its several sense, and therefore held that the Act requires that there be two forms of evidence of each employee's intent, one of which is a dues deduction authorization. We submit that this interpretation creates an internal conflict within Section 9A-5 in that the very next sentence, the third section of 9A-5, requires that there be an immediate election if there is a demonstration of fraud or coercion in the, quote, dues deduction authorizations, comma, and other evidence upon which the does not include dues deduction authorizations. Mr. Post, let me ask you this. If the legislature requires that the showing of majority support must be based on, and again the quote, dues deduction authorization and other evidence, how can we possibly say that a showing without dues deduction authorization passes muster when this is the one type of evidence that the legislature singled out as necessary? Well, I think the whole entire phrase establishes a category of evidence. If you look at the coupling of dues deduction authorization and other evidence in the second sentence, and if you look at the need to rely on evidence that the board would find reliable in the third sentence, it's creating a category of evidence of similar reliability to dues deduction authorizations. Well, wouldn't that just render the term dues deduction evidence superfluous? I mean, why didn't they just say other evidence? No, it would not. If they simply said other evidence, that term would be wholly undefined. We know by coupling it with dues deduction authorizations, there has to be a degree of reliability attached to that. And I submit the board's regulation, which goes on and requires that any evidence of majority support, whether it be cards or petition, contains specific language stating that by signing the card, the employee acknowledges that if a majority of his or her coworkers in an appropriate union sign evidence of majority support, the card can be used by the petitioner to obtain certification as the employee's exclusive representative without an election, renders all the evidence of majority support a similar reliability to dues deduction authorization cards. In fact, it's better than a traditional dues deduction authorization card because they merely empower the employer to deduct dues from an employee's paycheck without any reference to whether they will get some representation out of it. A traditional dues deduction authorization card is not a very good board requires in its regulations would be preferable evidence of that intent. But we're more concerned with the reading of the statute than whether or not we think the legislature should have passed something that is more palatable with what you're saying. Well, yeah, then the wording is the best evidence of what the legislative intent is here. But it has been interpreted in its joint sense and its several sense and depending somewhat upon the format that it's placed in. If it indeed lists a number of characteristics separated by the word or you can have a defined unit in the same way than if it lists a number of subcategories with the word and so how it's simple point is that the third sentence cannot be reconciled under a definition that requires two forms of evidence in the second sentence. How could the board otherwise rely on evidence other than the dues deduction authorizations that the second sentence requires that there always be dues deduction authorization. So our is this strictly a question of statutory interpretation. Yes. Yes. And so how how is it that the board argues for use of discretion standard. It's the certification is typically reviewed under an abuse of discretion standard and I set that out in my brief because it's an investigative administrative sort of statute which should be subject to a novel review with the addition that a reasonable interpretation of ambiguous statute given by a minister of age and created to implement it is given some deference and it was not in this particular case. But you're you're you're right on that point. The appellate court's interpretation consistent with the purpose of Section 9 8 5. According to the bill Senate sponsor this. These sections were intended to provide a more expedient means to organize so that the employer had less opportunity to interfere in the process of how its employees picked a representative. Dues deduction authorization cards the traditional card certainly is not a good fit with that particular purpose. As I said they require a deduction of dues. They don't talk about whether you want representative representation. More importantly perhaps is they tend to cut out all of those fair share employees. You you have a right for union representation without paying full dues to a union. You may have religious you may have political objections to joining the union and to paying full dues to them. The statute has always protected the rights of these employees to participate in the process. They might actually want collective representation and they might actually in an appropriate way of obtaining that representation. And there's no indication that the General Assembly intended that to occur. Further I think following up somewhat on Justice Thomas's comment under the appellate court's interpretation the term other evidence is wholly undefined. It's under the board's interpretation where you have to provide a context to that. We submit that under the board's interpretation these couplings gives a real meaning to the act in the clear language required by the board's regulation on the evidence of majority support ensures an accurate expression of employee intent far more accurate than a traditional dues deduction authorization card would have been. The board's interpretation better fits all of the language of Section 985. There are no inconsistent provisions if you use its interpretation. There are no wholly undefined terms such as other evidence under its interpretation. And the purposes of Section 985 are better met. It really doesn't make sense for a board to have a representative certified to require two forms of evidence and particularly evidence from the same employee. I don't know what the second would be other than we really mean it or so. So even if the board's interpretation were not better than that submitted by the sheriff or found by the appellate court if it were merely as reasonable courts in this court included have found that they would typically defer to the administrative agency's interpretation if it's a reasonable of an ambiguous statute. And this clearly is. So in fact the appellate court's substitute interpretation is inferior to that of the board. And we submit that that portion of the board of the court's decision needs to be overturned. There's a second significant issue in this case having to do with the employer's right to review the evidence of majority support. Now the issue isn't whether the certification is a final administrative action. It is. And the issue really isn't so much the court's ability to review the cards except in instances like the prior case in the emergency rule where the insurance clerk sent the sealed documents to the employer's counsel. I don't think we're overly concerned. There will be some chill on the employee's willingness to sign a card by the fact that it's reviewing by the court as there is probably being reviewed by the board. But it's an altogether different type of chill if it's being reviewed by the entity that can provide retribution against that employee that can block future promotions, et cetera. That's the issue. The big issue here. That isn't cured by it being redacted? Well, redacting is an interesting suggestion because these cards have the employee's name written on it. They have a date. If they're a dues deduction authorization card, they'll have a social security number, other identifying information all handwritten on the card. They're not going to have access to typers as they typically would not have access to typewriters to type in this information. So if you wanted to redact it, you are in effect whiting out the employee's right to review the evidence of majority support. Everything that's written on the card, and you're back to the original form. Now, in the Forest Preserve District case from which a PLA is pending before this court, the union went ahead and sent a blank form to the employer. And I believe that is in the record in that case. And perhaps, you know, that can be done. But if you redact it, then you need to explain to each employee what redacting means. You need to create an assurance to them that they're not going to have access to that information. It'll be fully redacted, and they're not going to be identified. I submit that your average employee is still going to have a little bit more hesitation in signing a card if they know it's going to go to the employer, whether redacted or not. So I don't think that is an adequate protection here. Now, the employers previously had no right to review the 30 percent showing of interest under the old procedure. In fact, there's cases that say it was a 30 percent showing of interest, and that's not true. That's not an unfair or illegal objective to even try to do that. The employer did have a little bit more involvement with the ballots after an election in that they could have observers there, as long as the observer is not a supervisor who might intimidate the employees, et cetera. But the ballots have no identifying information on them. And frankly, I'm unaware of any administrative review of a labor board certification that had to do with the quality of the ballots or whether the board counted the ballots correctly. Those administrative reviews have typically involved the appropriateness of the unit designation. I don't even recall ever seeing ballots bound up in a record under administrative review post-election certification. So either the prior 30 percent showing of interest or in the election procedure, the employer had very little, no opportunity really, to determine how the employee voted here. If you give them these dues deduction authorization cards or even the redacted versions, you're creating a chill in the employees who realize that their jobs may be at stake, their potential for future promotion may be at stake. And that's what we're trying to do by being at the forefront of this organizing effort. And courts have recognized the significance of this chill. I've set out quotes from various federal courts to this extent, and they really just state the obvious. If you were an employee, you would be reluctant to sign such things if it could ever come back on you. According to Bill's sponsor in the Senate, the purpose of Section 985 was to move the employer out of the employee representation process. If you allow them to have access to the evidence of majority support, you've definitely put them back into the process. And I submit an attempt to review these cards is really an attempt to undo the legislation. I'm not sure how useful this provision would be if that were the case. Isn't an employer's ability to show fraud or coercion, which they're allowed to do, hampered without access to the evidence of majority support? The employers have control of the workplace itself, so it anticipates that the employer would become aware of shenanigans happening. The provision that they be able to show evidence of fraud or coercion must occur before any access to the cards. I submit, no, it's not intended that they see the cards and then go on a fishing expedition. They have to have evidence of fraud or coercion based upon the natural consequences of controlling the employment environment and being aware of what is going on. I don't think that it was intended to create that bypass. The question the employer's access to the cards raises the larger question of the overall role of the employer in this proceedings. As I said, the employer has no inherent property or liberty interest at stake here to which due process would apply. If it doesn't attempt to operate in the one role defined for it here, it's essentially waived itself. And it cannot be an aggrieved person within the meaning of Section 9I, the Section 9I's provision that allows administrative review. If it's not an aggrieved person, it really doesn't have any right to present an administrative review complaint. That was the intent of this, is to move the employer out of the process, and I think the appellate court's decision is erroneous in moving him right back in. But I see I'm encroaching on Mr. Mazzoni's time if there are no further questions. Mr. Chief Justice, may it please the Court, Joseph Mazzoni on behalf of the Metropolitan Alliance of Police. I'd like to address two issues primarily from the union's perspective, and that is the disclosure or the review by these cards by an employer. Most employers, and it's certainly the case in DuPage County, have a real finger or thumb on the pulse of a campaign by a union. There are many employees that will go back to the employer telling them when the meetings are, where they are, what kinds of things are being said, and I'm not sure that the disclosure in and of itself would provide any evidence of fraud or coercion. I don't know what you would see on the card other than obtaining the identity of the employees who are supporting the campaign by the union. The Second District recognized the inherent risk of those kinds of disclosures by suggesting the redaction. These cards aren't blindly submitted and approved. There is a review by the Labor Board as to their accuracy, there's name checks, there's writing checks. At one point, the employer in this case suggested hiring a handwriting exemplar investigator to investigate these signatures. The legislative intent of the entire section was to expedite, and I have firsthand experience of how long these matters can pen. And I'll talk about that with the dues deduction cards, and those are the only two issues that I will address. The courts have been very clear, federal and state, in protecting the rights of employees who want to organize from inappropriate disclosures. By the time that we are certified, we can protect, we can step in and we can protect employees who are being retaliated against or somehow coerced or affected or impacted in their employment environment. It is difficult sometimes to get these cards signed, and the board in the majority petition has raised the level. As Mr. Post explained to you, we could have an election where literally 20 or 30 percent of the entire employment group can certify in an election a representative. It's the majority of votes cast that day. But the burden on the union now is to provide 50 percent plus one of all listed employees as are interested in becoming represented, in this case, by the Metropolitan Alliance of Police. The burden by the legislature to raise that threshold, that benchmark, is indicative of the importance of the cards being signed. It is our extreme request on behalf of our union and the unions that have filed briefs in this case that this disclosure not be allowed, that there not be an opportunity for the employer to become even more involved in the system. They have ample opportunity to make their allegations. Thank you, Judge. I appreciate that, Mr. Justice. I'll go right to the cards, the dues deduction cards. The dues deduction cards does not inform an employee of the purpose of the card. A dues deduction card, as outlined in the county's brief, simply says pay us money, and you will pay us the amount of money that the union certifies. In this particular case, had that been done, at the outset of this case, we would have employees of the DuPage County Sheriff's Department paying dues to the Metropolitan Alliance of Police for in excess of three years without us having to perform any service or be able to justify the collection of those dues. We don't believe that was the intent of the legislature. Mr. Chief Justice, thank you for the extra moment. Thank you, Mr. Mazzoni. Mr. Baird. May it please the Court, my name is Jim Baird, and I'm honored to appear once again before this Court. I represent the County of DuPage and the DuPage County Sheriff in this matter. On their behalf, I urge the Court to affirm the Second District's finding to void the union certification in this matter, to find that Labor Board Rule 1210.80D2 is invalid, and to affirm the Court's award of attorneys' fees. The major dispute here concerns the interpretation and language of 9A5. That's a legislative interpretation. The standard of review would be de novo. On the fees issue, the standard would be abuse of discretion, because the appellate court was the trier of fact on the fee issue. I would like to turn my attention to the backdrop of the meaning of 9A5, because there's been a lot of parsing of words, and I'd be happy to address the arguments made by the Board. I think they're totally incorrect. I'm happy to share the reasons why. But a little bit of history might be helpful. When the Labor Act was first passed for a union that couldn't work out a deal with the employer to get certified, they had to have this 30% showing of interest. Significantly, the General Assembly did not in any way set out the standard of evidence. It simply said, under such regulations as prescribed by the Board, 30% or more showing of interest. And the reason this is important is presumably the legislature knew all of this. In those regulations, the Board set out the standard of evidence, and they said it may consist of authorization cards, petitions, or any other evidence, or any other evidence demonstrating that at least 30% want the union. Now we come to 2003, and the legislature decides to amend the law. Why did it amend the law? Well, we look to legislative intent. I mean, that's one of our interpretive guides. What we have is the off-quoted provisions from Senator Sandoval, and he's about the only one that provides the legislative history. And he says, in an off-quoted phrase that he entered on May 21 of 2003, the election process, the election process can be cumbersome, as we all know, during which time the employer has control of the employee and can intervene in the employee's decision. And in fact, employers routinely use this time, from the filing of the petition to the election, to scare workers into voting against the union, even if the workers want a union. Solution to this problem for public employees is to allow them to vote for a union through the process called card check. So the difficulty, the ill, the General Assembly sought, and by the way, we disagreed with them, but that's not at issue here, is the employer's involvement from the time of the filing of the petition to the holding of the vote. Employers would campaign as campaigns go, and minds would change. The General Assembly said, no, we don't want that to happen. So they enacted 9A5. Now before we parse the words 9A5 and what it does, let's talk about what the General Assembly didn't do, because I think that's important in terms of our interpretation. The General Assembly didn't address this the easy way. And that is by taking Section 9A and simply amending it, where it said if you have 30% showing you have an election, more than 50% certification. It didn't do that. Why didn't it do that? We contend in the second district file, that because the General Assembly intended a different standard of proof. When the General Assembly enacted 9A5, it did not say authorization cards, which was in the regulations, and presumably it knew about. It didn't say authorization cards, petitions, or other evidence. It said authorization cards and other evidence. Now the other evidence is the kind of evidence the Labor Board under 9A had been collecting for 18 years under showing of interest. The change was dues authorization cards. Now I'm delighted that the board, their representative, acknowledges that dues authorization cards mean something different than a regular showing of interest. In our view, the General Assembly said, look, if we're going to end workplace democracy, we're no longer going to have the secret ballot election process. We believe that certain assurances should be given that actual employee choice is being reflected. Consequently, they requested two different forms of employee commitment. One is the other evidence, the same type of evidence that had always been collected under 9A, and that is some designation by a majority that they wanted representation from the union. And, in fact, in the rules now they've added, and it must say that if I sign this I know I'm doing this in lieu of an election. So there's a designation that we want the union to be our representative. That's the other evidence. That's the other evidence that the board had been collecting for 18 years and relying on. And dues authorization, the second form. And what's that for? Because that's an entirely different animal. And in that regard, I would refer to Meekie Labor Union's submission to this court on page 6 where they point out that a dues authorization card is, and I quote, an independent agreement by the employee to be a union member and to have the employer deduct union dues from the employee's paycheck. A financial commitment. So the General Assembly... in the process of when the union became the representative. Thank you very much. That's a very important point I'd like to address. In our view, my understanding, at least our position is, that once that dues authorization card was collected, it wouldn't be presented to the employer. There would be no reason to present it to the employer. You present it to the labor board, and the labor board checks it to see if there's a majority. If there is, and if the other evidence also has majority, the labor board would issue its certification. Give the cards or their copies, facsimiles, back to the union. Maybe the labor board would even keep them. Those cards would not be presented to the employer, wouldn't have to be presented to the employer, period, under the bargaining situation. And Mr. Mazzoni said his people had been paying dues for three years. If he had come and presented dues authorization cards, we wouldn't have honored them. We had no duty to bargain with them. We had no duty, we had a duty, I'm sorry, the last six, nine months. But prior to that, prior to certification, there would be no, and even if he presented them, we likely wouldn't be doing that, and he wouldn't have to present them. So no, there'd be no duty to present those to the employer for purposes of checking off dues, or taking out dues. Remember now, just because the union has a card that says I want the employer to deduct my dues, the employer has no duty to do that. The employer has to reach an agreement with the union to do that. And that's one of the concerns that we have, and I'll go back to my analysis now. Under the board's rules and regulations, and please, please take a look at them, under the rules and regulations, 121080, under 9, I'm sorry, under 121080D1A, is the standard of proof necessary for the showing of interest for an election. It says that such showing may consist of authorization cards, petitions, or any other evidence. The same language as they had before. Now we have new language from the General Assembly, dues deduction and other evidence. The labor board's rules and regulations say the very same words that they had before. The level of evidence is authorization cards, petitions, or any other evidence demonstrating a majority. So in their view, it's the same evidence under each situation. Under the second district's view, they're different forms of evidence, and they have a different level of commitment. Now, we all know, the elected officials all realize that the level of commitment obtained by a person, a voter, whoever, signing a petition in front of the requester is different than when the person casts their ballot in secret. The reliability of which will have the true expression of the views is different. The General Assembly said we don't need a vote anymore in union certification. But quite logically, they said in its place, we want to make sure there are two understandings. One, the employee wants a majority to represent them for purposes of bargaining, and they know that by signing the card it could be used in lieu of an election. And secondly, they've got to sign a dues authorization, dues deduction authorization, which has the aura of a financial commitment, a potential financial commitment. And those are not inconsistent. Now, it's been said that the whole purpose was to get the employer out of the certification business. There's no support in the record for that. The only support is Senator Sandoval's statement, and that says we want to cut down the time where an employer can campaign to change minds. So now under this process is the second circuit. The second district has interpreted. The union would get signature on a majority representation card, signature on a dues authorization card, and they could do it in secret. The employer doesn't have to know anything about it. And by the way, they better not do it on site during work time. And only until they've got their evidence ready do they go to the board, file a petition, board checks it, and boom, certification. There's no role for the employer in the second district's interpretation or ours. I wish we had one. But we're dealing with the legislation before us, not what we would like. So there is no violation of policy whatsoever. Now, questions have been raised about, well, should the employer be able to see the cards? Well, I don't know that we have to address that here. And that is to say that the second district said the court should be able to review them. By the way, Mr. Mazzoni and others have said here's what the card says. That's news to me. The sheriff has never been allowed to see these cards, blank or otherwise. We have no idea even if such cards exist. And by the way, they may have all been signed by the same person. We don't know. We can't see them. They may be misstated. We don't know. I don't know what they say. The sheriff doesn't know what they say. The county doesn't know what they say. We're not allowed to. And by the way, the reviewing court can't see them either. We filed a motion before the second district to have the cards be made part of the record. The labor board, they've apparently changed their position now, but they opposed that motion. We argued and it lost. Now, once we got to the merits, I think the second district realized that there may have been an error and they should at least have the reviewing court should have the cards to make sure they meet the standards of the statute to support the certification. And where in this legislative history does anyone come to the conclusion that Section 9I of the Act, which provides an aggrieved party with the right to challenge a final order, which is a certification as a final order under 9I, to challenge that before the courts? That right, and employers always had that right. I mean, that's the last time I was here was on challenging a certification. That's never been contested. By the way, it wasn't addressed by the court either in the second district. It wasn't even raised, as I recall. But more importantly, that wasn't changed. That right hasn't been changed. And if it were, that itself would be a sea change. I mean, we've always had the right to contest the appropriateness of a bargaining unit when someone was a supervisor or not. And the question was raised about what about the ballots? And the Attorney General's representative said, you can't see the ballots. Why, of course you can see the ballots under the National Labor Relations Act. If there's a challenge to the appropriate markings on a ballot, that becomes evidence and there's a hearing, and that ballot is brought in. The observers review every ballot while it's counted. And this really is part of the star chamber nature of the rules that have been adopted by the Labor Board. We have no idea, at least where there's election, you see the people come in, you see them go out, you see them mark something. And they don't have to mark the ballot, but they appear to. And then you can review the markings. And then when the ballots are counted, you're there to see they're counted. And you can verify. And if there's a question about a hanging chad or something, you can raise an objection. Here, it's all secret. We have no rights as an employer, and we'll argue with that with the board down the road, but here the appellate court, second district, had no right to review that evidence. And that wasn't going to chill anything. And, by the way. Counsel, if I may. Yes. It's the question of deference to the board's finding of a meaningless statute. In light of the appellate court's statement that the board's interpretation was reasonable, what impact does that have on the outcome of this case? Well, in this case, we've had de novo review. And the answer simply is the court said that their interpretation at first plus was reasonable. On careful analysis, the court disagreed with the board. And, as you know, there's ample precedent before you. But they never withdrew the classification of reasonable as to the board's interpretation. And, frankly, Your Honor, we wish they had. And we thought that was a gratuitous comment, and we've had to deal with it. The fact of the matter is, at first blush, and without going into interpreting this in the historical context in which it's arisen, one might say that it was reasonable. But whether it's reasonable doesn't make it accurate. It doesn't make it correct. Okay. Is there any truth to the statement that if the board's interpretation is reasonable, we should give deference to the board on that issue? You should not defer to the board. You totally reject that. Deference, I understand. Deferral, I don't. If the board is wrong, their view should not carry the day. And I don't mean to make a cheap shot, but the very last time they interpreted the emergency rules, they weren't right about that either. Mr. Baird, before your time runs out, I want to ask you this. Yes. Under your position in this case, are you saying, let me put the question in a hypothetical context, because I don't know the exact numbers. Let's say there's 100 MAP members that both sides could agree on that are eligible to exercise their choice. Let's just say that's the agreement. Yes. If MAP submitted 100 cards, 100%, indicating employee choice, you're saying that under your view MAP would also have to submit something else for the board to look at? Yes. They'd have to submit just what the General Assembly required, dues, deduction, authorization. Mr. Baird, that was my question. If they submit dues authorization cards from 100 members that represents 100%, do they then also have to? Yes. The answer is yes, Your Honor. And as the representative for the board pointed out, it's because the cards are for different purposes. The one card indicates the view of the employee to have the union represent them. The other says I will make a financial commitment to the union. Each of these types of evidence has a different purpose. So, yes, we believe there would have to be a majority of each, and they could be obtained simultaneously. There's no necessity of any employer involvement in that process, and it wouldn't delay the process one bit. Now, there's been some question about standing. I hear no questions on that. I assume that's behind us. And also on the bargaining unit, the waiver, we've argued that in a brief. If there's any issue of addressing the bargaining unit, that would be done first, in our view, by the district court, the appellate court, sorry, and not by this body. I want to thank you very, very much. If there's no other questions. Mr. Baird. Yes, sir. The appellate court reversed and remanded for further proceedings. Is that what you're requesting, that it be remanded for further proceedings? Your Honor, I am not going to disagree at this point with the appellate court. So I am not taking a different position than in their order. So, yes, I think it should be remanded for further proceedings. I agree with the court that the Labor Board has got to redraft its rules and regulations to accommodate conflicting interests of the parties. They ought to have the first opportunity to establish what the proper rules of the game are under card check. I shouldn't say game. It's a serious business. But what the rules will be, they should have comment from all impacted segments, as the rulemaking process provides. And after that, the board will use its expertise to come up with a fair set of rules and regulations which does reflect the will of the general assembly. Thank you, Mr. Baird. Thank you, sir. Appreciate it. Thank you. Mr. Post, rebuttal. Yes, thank you, Your Honor. I think I initially should take some issue with the suggestion that the board's request for signature exemplars was some sort of meaningless act. The board does review these signatures. They could not all have been one particular person. Ballots obviously do not have identification of the people voting on them. That's a poor reason to allow access to these demonstrations of majority support. And also on the reference to the dues deduction cards and its value. Well, a dues deduction card is, in essence, on its face a contract. And the real question has to be, what is the employee's understanding when he's confronted with a card like this? Does he understand that he's voting for a union, and as soon as there's 50%, it's there? Or does he think that he might be dinged with dues without getting anything out of it? So whether the employer gets these things is not as critical as what the employee understands these to be. That's why it's such a poor choice here, and I don't think the only choice. I didn't hear any comments regarding those fair share employees who have a right to request representation, even though they do not want to join the dues. I'd like to get to Justice Fitzgerald's question with respect to the appellate court's ruling of reasonableness on the part of the board. I pulled the opinion, and what the appellate court says is both parties' interpretation was reasonable. They use it to assert ambiguity in the statute itself and then go on to statutory construction when ambiguity is asserted with respect to a statute. Our review is de novo. We don't have to take the position they took, and I'd like to get back to if there is no ambiguity, if we agree with the first premise that there's an ambiguity, get back to the point, and I know you raised it quite a bit on your initial argument, that why doesn't and mean and? Cards and. Well, you know, we decided to go to... I want you to do it in the context of what Mr. Baird said, which was the historical analysis of what the legislature did in specifically outlining that dues deduction cards were necessary. Well, what they did was they referred back to the regulation, which set out particular three items, authorizations, evidence, and something, I can't remember the exact terminology, but it was separate by the word or, but it listed particular items, whereas this statute frames a category of types of evidence here. And, as you know, can mean, it's joint sense or it's several sense. If you bequeath something to a relative and her heirs, it, of course, isn't bequeathing it to both people. So there is this tradition here, and there is some ambiguity in the mere use of and.  What I've not heard from counsel is any explanation of how the third sentence in Section 985 can be reconciled with the second sentence. And if that is the case, then I submit that our interpretation, which does not have this conflict, is the better interpretation. Even if it were not, if indeed they were both reasonable interpretations. And I don't, you know, I'll have to go back and read the decision again, Your Honor, but I don't think that was merely to arrive at the conclusion that there were some arbitrariness or some ambiguity in the statute. The mere phrasing of the statute itself created ambiguity in its justification in Section 3, the third sentence. So there is ambiguity in the statute. I think that the appellate court did, in fact, mean to say that we were, we had a reasonable interpretation of that statute. It disagreed with it, but my objection to the appellate court's decision is the, one of the tools of statutory instruction is reference to the administrative agency's interpretation, if it's reasonable, of an ambiguous statute, if it's a statute it was called to implement. And that statutory interpretation tool was completely ignored by the appellate court here. But the, I submit that the history is equally supportive of our position here. A 50 percent showing is in many ways more significant, a 50 percent showing of majority interest is more significant than an election procedure in which only 40 percent of employees vote and you only have 21 percent of it choosing it. I hate to stop you again. Yes. But since Mr. Baird doesn't get to get up here again, in his brief I believe, and that's what I want you to read, but in his brief I believe he indicated that the second sentence and the third sentence referred to, had different purposes. True. Obviously we've been talking about the sentence second, what the second sentence had to do with, but I believe their position is that the third sentence addresses the board's approach when confronted with fraud or coercion. And if you look at it that way there is not an inconsistency between the second and third sentences. No, no, that does not resolve the issue here. The third sentence says if there's fraud or coercion you get an election. Boom, that's the answer for that. It doesn't say if there's fraud or coercion then you can rely on only the other evidence. In fact, it says, you know, comma, and other evidence upon which the board might reasonably rely, and that entire phrase is in juxtaposition and contrast to dues, deduction, and authorization. So the purpose of the third sentence, or the solution of the third sentence, if there's fraud you get an election. It's not that only in those circumstances can you rely on other evidence. There has been no presentation of a reasonable interpretation of situations in which the board can rely on other evidence, which the third sentence clearly contemplates. That is consistent with the second sentence's dues, deduction, authorization, and others, the appellate court's interpretation of that term. I believe I mentioned the importance of the fact that all the fair share employees are being disenfranchised under the appellate court's interpretation here. If they have to file dues, deduction, authorization cards, they can't vote. There's an inconsistency within Section 9A5. Most fundamentally, to talk about the history and the purpose of this, most fundamentally it was to shorten the time so that the employer had less involvement in this process here. And the board's interpretation is consistent with that as well. With regard to Section 9I and whether they are person aggrieved within the meaning of that term, if Section 9A5 only contemplates one role for an employer, that is presentation of evidence of fraud or coercion, here they didn't attempt to do that. So if they did not participate in the one role contemplated by 9A5, consequently the end result of the board's processes could not have rendered them an aggrieved party. True, they are subject to the act. They've always been subject to it, and when there's a unit certified, of course, there is some bargaining obligation on that, but it's not the board's action that makes them an aggrieved party and consequently failed to see how they have standing to bring an administrative review in this particular context. The scope of the unit, and I submit, as I mentioned before, there have been administrative reviews of certifications after an election. To my knowledge, they involve the proper composition of the unit. I've never seen one where the ballots needed to be looked at or anything of that nature. The employer here can, if it has supervisors in the unit, for example, bring a unit clarification petition after the certification, and those employees can be removed in that process now. To the extent that they have argued that the correctional officers, who were never contemplated to be in this unit, the proposed unit brought to the board does not refer to them. It excludes them. To the extent to whether they are peace officers or not really isn't important. It's really a secondary issue, particularly since the employer failed to present an argument that the unit as proposed was inappropriate in its opening brief to the appellate court. I submit these petitions have been pending for three years, Your Honor. We ask that this be reversed. All right. Thank you, Mr. Post. Thank you, Mr. Mazzoni, and thank you, Mr. Baird. Case number 105395, the County of DuPage et al. versus the Illinois Labor Relations Board State Panel et al. is taken under advisement as agenda number 12.